Olive, Admr., *v.* Walton et al.

JAMES OLIVE, Admr., &c., *v.* JESSE B. WALTON et al.

1. STATUTES, CONSTRUCTION OF.—In the construction of statutes we must look to the spirit and object of the Act, and construe its language with reference to the policy indicated by it.

2. HUSBAND AND WIFE: SEPARATE ESTATE OF WIFE: HOW IT DESCENDS.—The Married Woman's Law of 1839, and the amendment thereto, passed in 1846, were intended to secure to the wife a complete title to all such property as she might acquire, for the benefit of herself and children, and not to prescribe the form in which the conveyance of the title to her should be made, and they apply not only to property acquired by the wife, by a direct conveyance to her in her own name, but also to such property as she may acquire through the medium of a trustee, unless the deed of conveyance contain limitations contrary to the rules prescribed in these Acts; and, therefore, where slaves, since the passage of these Acts, were conveyed to a trustee for the sole and separate use of the wife, but without any limitation over after her death, they will, upon the death of the wife, descend to the children, and not to the husband, as at common law.

3. SAME.—The children of the wife who were entitled to succeed to her slaves, held under the Act of 1839, took them upon her death by descent, and not as a vested remainder; and therefore, when the wife died after the passage of the Act of 1846, all of her children are equally entitled to inherit her slaves held under the first-mentioned Act.

4. SAME.—The surviving husband is not entitled to a life estate in slaves held by the wife under the Married Woman's Law of 1846; upon her death they go immediately to her children.

5. PROBATE COURT.—The decree of the Probate Court, rendered in a proceeding for the distribution of an intestate's estate, charging one of the distributees with an advancement, alleged by the petition to have been received by him, and not positively denied by the answer, will be presumed correct, when the evidence upon which the Probate Court acted is not contained in the record.

Appeal from the Probate Court of Holmes county. Hon. Richmond J. Brown, judge.

The appellees, who are the children, and the issue of deceased children, of Mrs. Ailsey Olive, by her first marriage, filed their petition in the court below against James Olive, the surviving husband and administrator of said Ailsey, and also against Mrs. West, who was the issue of the marriage, between decedent and James Olive.   The petitioners sought distribution of the personal estate belonging to Mrs. Olive at the time of her death.

The material facts, as they appear on the record, are as follows: In the year 1828, the said James Olive and his wife Ailsey, were domiciled in the State of Georgia, and certain slaves were there conveyed to one Moss, in trust, for the sole use and benefit of said Ailsey, but without any limitation over after her death; afterwards, Moss conveyed these slaves to Jesse B. Walton, upon the same trusts as were specified in the deed to him.

In the year 1836, James Olive and his wife, and the trustee Jesse B. Walton, removed from the State of Georgia to this State, where they resided and were domiciled from that time up to the death of Mrs. Olive, which took place in the year 1852.   In 1842 or 1843, a slave was acquired by Mrs. Olive by purchase, and the title was taken in the name of Jesse B. Walton, her trustee.   This slave had issue, viz., four children.   On the 24th day of February, 1846, two other slaves were also acquired by Mrs. Olive, and the title to them was taken in the same way ; and, on the 28th February, 1848, another slave was acquired by her, the title to which was also conveyed to Walton, the trustee.   Between the years 1840 and 1845, a barouche, one horse, and one mule, and some household furniture, and, after the year 1846, a horse and other furniture, were acquired by Mrs. Olive, all of which were conveyed to Walton, as trustee.   All the foregoing acquisitions of property, were made by purchase, and with the means resulting from the labor and hire of the slaves conveyed to Mrs. Olive, in the State of Georgia, in the year 1828.

The petition charged, that in the year 1850, the said Ailsey Olive, had advanced to Mrs. West 160 acres of land.   To this, West and wife answered, admitting that they had received the land, but they also stated that said West had overseen for Mrs. Olive for four years, and attended to other business for her, for which he made no charge, supposing that the property given to himself and wife would

be a sufficient compensation, and though there was no express understanding to that effect, yet they believe that Mrs. Olive so understood it.

On final hearing the Probate Court decreed, that the slaves conveyed to the trustee in Georgia for Mrs. Olive, were upon her death, the property of James Olive, her surviving husband; that the slaves and other property purchased in this State after the passage of the Act of 1839, and before the passage of the Act of 1846, in relation to the property of married women, should be held by said James Olive during his lifetime, and afterwards should be distributed among the children of Mrs. Olive, by both of her marriages; that the property bought after the passage of the Act of the 28th February, 1846, should be distributed immediately to the said children. It was further decreed, that the land received by Mrs. West, in 1850, should be treated and considered as an advancement, and as such chargeable upon her share of the estate. The court also settled other questions of advancement between the heirs, including personal and real estate; but as no question was raised in respect to this action of the court, the proceedings in relation thereto are not set out.

From that decree, James Olive, the administrator, appealed.

*W. Brooke,* for appellant.

BRIEF OF COUNSEL FOR APPELLANT.

One of the questions arising in this case has already been decided in the case, heretofore before this court, of *J. B. Walton et al.* v. *James Olive.* The record now, as to a portion of the property, presents some facts which were in the former case not set out, and not before the court.

The case as now presented in full is as follows: Mr. and Mrs. Olive moved to this State from Georgia in the year 1835, bringing with them certain slaves, which had been conveyed to a trustee (J. B. Walton), in trust, for her sole and separate use, but without any limitation over at her death.

After the passage of the "Woman's Law" of 1839, and prior to that of 1846, certain other slaves were purchased by said trustee, with the proceeds of the labor of the others, for the separate use of Mrs. Olive, and the title taken to said Walton, as trustee, in the

same manner. One was purchased after the 28th of February, 1846, in like manner, and the title taken in Walton's name, as trustee, as with the others. (See Exhibits, and Olive's last answer ; also decree, in which the facts as to the negroes are fully set forth.) In the case as presented before, it did not appear that any negroes had been purchased between the dates of the Acts of 1839 and 1846, and though it appeared that one was purchased in 1848, yet the nature of the title, whether direct, or in trust, did not appear. As to the negroes brought from Georgia, the question is definitely settled by this court. It in terms approved the proposition contended for on that occasion, that where personal property is conveyed or limited to the use of the wife during life, either by the medium of a trustee or otherwise, and no limitation over, at her death the property inures to the husband, *jure mariti*, to the exclusion of her next of kin.

If this is considered an open question, the court is respectfully referred to the brief filed by me in the case before.

But, this question being considered settled, the only controversy is as to the effect of the Woman's Laws of 1839 and 1846, on the property subsequently acquired. I contend that this property, though purchased after the passage of those laws respectively, is not at all affected by them, but follows the disposition of that brought from Georgia, and that it all belongs to Mr. Olive, the husband. Mrs. Olive died in 1852. The only pretence upon which the claim of the appellees to the property purchased in this State, can be based, is the provision in the Acts of 1839 and 1846, that personal property, or rather slaves, held by femes covert under them, shall on the death of the wife go to the children. But I contend, that neither the girl Sally, purchased from Mr. Fulty in 1848, nor the other negroes, purchased after 1839, and prior to the 28th Feb. 1846, were held under or subject to the limitations of those Acts. The language of the first section of the Act of 1839 is as follows : "Any married woman may become seised or possessed of any property, real or personal, by direct bequest, demise, gift, purchase, or distribution, in her own name, and as of her own property," &c. The Act of 1846 is simply a modification of this, and intended only to apply to the same description of property, or property acquired in the same way, *i. e.*, by direct bequest, demise, &c. Now it is

evident from the last answer of Mr. Olive, filed in answer to a bill of discovery, and the exhibits, that none of the negroes acquired in this State come within the terms of the statute, because none of them came to Mrs. Olive by direct bequest, gift, demise, or purchase. On the contrary, the title to all of them was made to Jesse B. Walton, as trustee, for her separate use and benefit. Where there is any doubt as to the true construction of a statute (should there be any in this case), reference should always be had to its object and intent, and the mischief to be remedied by it. As the law stood prior to 1839, all personalty conveyed to the wife by direct gift or purchase, at once vested in the husband, and became subject absolutely to his disposition, and subject to his debts. It was to remedy this evil that the Acts of 1839 and 1846 were passed, and hence they are confined in terms to such property alone. Property, whether real or personal, which was held in trust for the sole and separate use of the wife, never was subject to the control or liabilities of the husband ; hence, in reference to such property no such evil existed, and there was no necessity of passing any woman's law on the subject. All persons, after the passage of those laws as well as before, could convey and take property on such terms and under such conditions as suited them. The Acts referred to, only coming into operation when no other specific direction, or contract, was made or entered into. The property here referred to, was by the terms of purchase as effectually secured to the separate use of Mrs. Olive, free from the control and liabilities of her husband during her life, as it could be by the Acts aforesaid. As such it did not come within the mischief or meaning of those Acts, and there is no necessity or propriety of bringing it within their operation. J. B. Walton, the trustee, held the legal title to it all, and it is all subject to the same limitation, that is, it at once vested in Mr. Olive, on the death of his wife.

It seems from the facts as set forth in the pleadings, and as recited in the last decree of the Probate Court, that the parties in interest did not choose to avail themselves of the provisions of the Acts of 1839 and 1846, but preferred (as they had the privilege of doing) to regulate their rights by the law as it had previously existed. In other words, they chose by contract to make a law for themselves. The representatives of Mrs.. Olive and her trustee

must be content to abide by the consequences of this contract, and cannot be heard in an attempt to invoke the aid of a law, of whose provisions they did not, at the proper time, choose to avail themselves.

The Acts of 1839 and 1846 referred to, were not designed to abridge the rights of persons to dispose of property, or limit it otherwise, but was intended only as a rule of descent, or distribution, where no other disposition had been made.

But as to the negroes purchased in this State, prior to the 28th February, 1846, I contend that even by the Act of 1839, they vest in Mrs. West, the only issue of the marriage between Mr. and Mrs. Olive.

I am aware that in more than one case this court has held that the provision of the Act of 1839, giving property held under it to the children of the marriage on the death of the wife, was only one of distribution, conferring no vested rights, on such children, and could be repealed, or changed, by subsequent legislation.

These decisions, however, have been to some extent shaken by the case of *Garrett* v. *Dabney*, 5 Cushman, 335. In this case, I think the true rule of construction of the Woman's Law of 1839 was suggested, and that is, that said law is to be regarded to all intents and purposes as a marriage settlement. This Act was intended not only for the benefit of femes covert, but also of their offspring, and if by inadvertence, the legislature regarded only the offspring of the marriage then existing, the rights vested under it are none the less beyond future legislative control. It is true, that tested by the rule, distinguishing vested from contingent remainders, the interest of the children of such marriages are not technically vested, because the husband and wife by joint acts can defeat it by alienation of the property, but still that interest is a right, though but a contingency, which can be defeated in no other way. There may be a vested right to a contingent interest, at least so far vested that no power save that provided for contingently can deprive the party of it. A remainder may be ever so contingent, yet no legislative power can deprive a party of his right to it, such as it is; and such a contingency I conceive this to be. The wife and husband by joint act alone have the power to defeat it. The legislature by subsequent act cannot affect it.

But there is a gross error in the decree apart from this. The

petition alleges the conveyance of certain lands to West, to be an advancement, which should be brought into hotchpotch. The answer of West and wife fully denies that it was an advancement, and avers that it was made for services rendered by West, and a part purchased by him. (See both answers of West.) The deeds express a valuable consideration, and there is no other proof; yet in the face of this, the court decree that the land should be brought into hotchpotch. This is clearly error.

*Thomas Botters,* on same side, filed an elaborate argument.

*J. M. Dyer,* for appellees.

### BRIEF OF COUNSEL FOR APPELLEES.

This case was once before in this court, and is reported in 7 Cushm. 270. I think the principles then settled give such of the slaves in controversy, as were acquired since the passage of the Woman's Law of 1839, to Mrs. Olive's children; certainly, they do those purchased since 1846. The court, in the opinion in that case, says that the proof tends to show that part of the slaves were acquired since the passage of the Woman's Law of 1846, and conveyed to Mrs. Olive or to her use, and if so, that they descended to her children.

Mrs. Olive had a life estate in the slaves, conveyed in Georgia in trust to J. B. Walton, for her sole use. If she had a life estate in them, it follows that she was entitled to the proceeds of their labor. To say that she had a life estate in them, but that their earnings belonged to another, would be a contradiction. It would be inconsistent with the idea of property : property being the exclusive right of possessing, enjoying, and disposing of a thing. There cannot be two independent owners of the same property. The negroes bought in Georgia belonged either to Mrs. or Mr. Olive. That they belonged to her, during her natural life, all the authorities agree; and Mr. Olive, by inventorying them as her property, has so treated them himself. If they were hers, the proceeds of their labor, as before said, must likewise have been hers. With these proceeds, Sally was bought in 1848. The Woman's Law of 1846 was then in force, and authorized Mrs. Olive to hold property

independent of her husband; that being so, the title to Sally never in any way vested in Mr. Olive. Not having been bought with his money, nor conveyed to him, none of his marital rights would be violated by declaring her to be the property of his wife's children. If Sally had been conveyed directly to Mrs. Olive, she would unquestionably have been her property. Does the conveyance of her to J. B. Walton in trust for his mother affect her title, or in other words limit her interest to a life estate ? I think not. The Married Woman's Law does not in terms, nor by implication, make any difference between legal and equitable estates. A different rule of descents does not apply, in the one case from the other. The manifest spirit and intention of the statute is, that the wife's right to her property shall be complete, and on her death, that it shall descend to her children. What motive existed to give legal estates to the children, and equitable to the husband ? None.

The sixth section of the Act of 1846, Hutch. Code, p. 498, provides that if a married woman " dies possessed of slaves or other personal chattels, as her separate property, leaving issue of her body, either by a former or her surviving husband, such slaves or other personal chattels shall descend to her children in equal shares." Nothing is said about legal or equitable estates, but simply that if the wife dies possessed of slaves, &c., as Mrs. Olive did, that they shall descend to the children. She may be possessed of equitable, as well as of legal estates. The evident policy of the law was to give the personal property which came by the wife to her and her children. Its object was to enlarge her capacity to hold property. It would be a strained and narrow construction to confine the Act to legal estates alone,—a construction which this court refused to give it, in *Walton* v. *Olive*, 29 Miss. Rep. 270.· There it held that it applied to trust estates.

A trust deed might be so framed as to deprive children of the property and vest it in the husband on the death of the wife, but fit words would have to be used for that purpose. None such are used in the deed in this case.

The negroes and other chattels, acquired between the passage of the Acts of 1839 and 1846, likewise belong to the children. As before contended, Mrs. Olive had a life estate in the negroes purchased in Georgia, and if so, the proceeds of their labor was hers.

With those proceeds, the negroes acquired between 1839 and 1846 were bought. The proceeds being hers, it follows as a necessary consequence that what was bought with them would be hers also. A mere transmutation of money into property, could not change the title. A married woman can alone be divested of her property by the deed of herself and husband, duly acknowledged. Such is the language of the statute ; and it forbids the idea that a simple conveyance of property to a trustee for the use of a feme covert, will upon her death, vest it in the husband. To money, her title is the same as to any other property, and no reason can be assigned why it, or that bought with it, upon her death, becomes her husband's. Once hers, it must continue so, unless regularly conveyed by her and her husband, to some one else.

It is said that the Woman's Law of 1839 gave the proceeds of the labor of the wife's slaves to her husband. That is true, as to the slaves held under that law, but it is admitted by the pleadings in this cause, that the negroes acquired between 1839 and 1846 were paid for with the proceeds of the labor of the negroes conveyed to J. B. Walton, in Georgia, in trust for his mother. The latter negroes this court decided, in the case of *Olive* v. *Walton*, were not held under the Woman's Law of 1839, and therefore are not governed by it. But the proceeds of their labor being hers, and with them the negroes in question being paid for, they would descend as that law directs. They were bought whilst she was domiciled here, where a law existed, authorizing her to hold separate property, and it follows, that they must descend to her children, in accordance with the provisions of that law. Further, Mr. Olive, by allowing Mrs. Olive to purchase the negroes in the name of a trustee, and having returned them to the Probate Court as her property, has admitted her title, and cannot now dispute it. He is estopped.

It is contended by appellants, that Mrs. West, the issue of the second marriage, is entitled to the property acquired prior to 1846, provided the law of 1839 applies to it. The Act of 1839 provides that if a feme covert dies, that her slaves shall descend to her issue by her surviving husband. If that law was in force, Mrs. West would inherit the property, but its fourth section, under which she would claim, is repealed by the Act of 1846 (Hutch. Code, 498), which

Olive, Admr., *v.* Walton et al.

gives the property alike to the children of both marriages. If the last is constitutional, Mrs. West can only share with the other children. It is constitutional, unless Mrs. West had a vested right to the negroes under the Act of 1839. What is a vested right? "An immediate fixed right of present or future enjoyment." Fearne on Con. Rem. 1. Kent says, "An estate is vested, where there is an immediate right of present enjoyment, or a present right of future enjoyment." 4 Com. 202.

According to these authorities, Mrs. West had no vested right under the Act of 1839, when the law of 1846 was passed, for the title was then in her mother : and the daughter had no right to the possession or use of the property, and had no fixed right of future enjoyment, because the title was in Mrs. Olive, and the negroes could have been sold and conveyed by her and her husband's joint deed. Hutch. Code, p. 495, Sec. 6. This question arose in the case of *Marshall* v. *King*, 2 Cush. 85, and the court decided that the child of the last marriage had no vested right to the property, and that all the children must share equally.

*Lee* v. *Lee*, not yet reported, is to the same effect. That case determines, that a feme covert may dispose of her property by will by the consent of her husband, and decides necessarily, that her children have no vested right to her property upon her death; for if they did, she could make no disposition of it by will.

It is contended by opposing counsel, that the case of *Marshall* v. *King*, is overruled by the case of *Garrett* v. *Dabney*, 5 Cushm. 335. The only question in that case was, that if a feme sole made a will and subsequently married, that the marriage annulled the will. The rights of the children were not before the court. What the judge who delivered the opinion says, in relation to the rights of children, was not essential to the decision of the case ; it is a dictum only, and does not overrule the principle decided in *Marshall* v. *King*.

HANDY, J., delivered the opinion of the court.

This was a petition filed by the appellees in the Probate Court of Holmes county against the appellant, for distribution of the estate of his deceased wife, Mrs. Ailsey Olive, of which he was administrator.

The material facts appearing by the record are as follows: Prior to the year 1836, the intestate being the wife of James Olive, in the State of Georgia, where they resided and were married, with her own means purchased certain slaves, which were conveyed to Jesse B. Walton, as trustee, for her sole use and benefit; and in the year 1836, the parties removed to this State, bringing with them the slaves, which remained in the possession and enjoyment of Olive and his wife. In the year 1842 or 1843, a slave was purchased with the proceeds of the labor of the slaves brought from Georgia by Walton, and was held by him for the separate use of Mrs. Olive; and after the purchase, that slave became the mother of several children; and in like manner Mrs. Olive purchased, between the years 1839 and 1846, a barouche, one horse, one mule, and some furniture, and on the 24th February, 1846, two other slaves. Subsequently to the 28th February, 1846, one other slave was purchased with like means, and conveyed to Walton, and held by him for the sole and separate use of Mrs. Olive, as were also a horse and some furniture. Mrs. Olive died in the year 1852, leaving the petitioners, her children and grandchildren, the issue of a former marriage, and one child by her marriage with Olive.

Upon this state of facts, the court below decreed that the slaves brought from Georgia, belonged to the surviving husband, in virtue of his marital rights, and were not subject to distribution; and that the slaves and their increase, and the other property acquired by Mrs. Olive since the year 1839, were her separate property, and should be distributed according to law among all the children and grandchildren of Mrs. Olive; and from that decree Olive, as her administrator, appeals.

There is now no controversy with respect to the specific slaves brought by Olive and wife from the State of Georgia, that question having been settled when the case was heretofore in this court.

But it is insisted in behalf of the appellant that the decree is erroneous, in holding that the slaves and other property, acquired since the year 1839, were the separate property of Mr. Olive, and are within the operation and policy of the statutes of 1839 and 1846, in relation to property of married women.

The first position taken in support of this view is, that the conveyances for this property, not having been made to Mrs. Olive

directly in her own name, but to a trustee for her separate use, are not embraced within the provisions of the statute of 1839, which merely provides that a "married woman may become seised or possessed of any property, real or personal, by *direct* bequest, demise (devise), gift, purchase, or distribution, *in her own name*, and as of her own property;" and, therefore, that the title must be considered as having been acquired and the conveyances made, without reference to the rights of separate property secured to the wife under that statute; but upon common law principles the surviving husband was entitled to the property by virtue of his marital rights.

In considering this question, we must look to the true spirit and object of the statute, and construe its language with reference to the policy indicated by it. Before the passage of the Act, a married woman was incapable of holding to her separate use, property conveyed directly to her, in her own name. The primary object of the statute was doubtless to remove that incapacity, and to secure to her separate use all property which she might acquire, except the same should come from her husband; and hence provision, in the first place, is made, enabling her to take by direct conveyance to her. But this is only a mode of accomplishing the end intended, the policy being to secure to the wife a complete title to all such property as might be acquired by her, to her sole and separate use, for the benefit of herself and her children. This was a new policy in our laws, founded upon enlarged views of protection and justice to the rights of a class of society entitled to the most liberal protection. It was the substantial right, which the legislature intended to secure, rather than to prescribe a form, as necessary to be complied with, in order to the enjoyment of the right; and therefore, the spirit of the statute is to secure to the benefit of the wife and her children, all property which may thereafter be conveyed to her separate use and benefit, without regard to the form of the conveyance.

This is manifest from the general scope of the statute, and especially from the third section, which provides, that "when any woman, during coverture, shall become *entitled to*, or *possessed of*, slaves, by conveyance, gift, inheritance, distribution or otherwise, such slaves, together with their natural increase, shall inure and belong to the wife, in like manner as is above provided, as to slaves

which she may possess at the time of her marriage." This language is broad and comprehensive, and shows that it was not intended to confine the benefit provided to cases of conveyance to the wife, *in her own name, and directly,* but that it was intended to embrace all cases, in which she should become *entitled to* or *possessed of* slaves in her separate right.

But it is said, that the separate use and enjoyment were already secured to her, as the law then stood, in cases of conveyance to a trustee, for her sole and separate use; and, therefore, that such cases could not have been in the legislative contemplation. The statute, however, makes a most important alteration of the old law, as to the transmission of the property, in cases of that sort. By the old law, it became the property of the husband on the death of the wife; but by this statute, it descended to the children, who appear to have been especial objects of consideration in instituting this policy. If the legislation was intended for the benefit of children, as it most clearly was, it is therefore manifest that there was a necessity for extending the policy, to cases like the present, in which the separate use, so far as the wife was concerned, was secured to her by the old law, but not to the children. And considering this important feature of the new policy established, it cannot be supposed that the legislature intended to restrict the benign policy in favor of children, to cases where the conveyance should be made directly to the wife, to the exclusion of cases in which the sole and separate use and possession were secured to her, through the medium of a mere nominal trustee.

We therefore think it evident that the legislature intended the benefits provided by the statute, to extend to all cases in which slaves should be conveyed to the sole and separate use of the wife, whether directly or through the medium of a trustee, unless the trust deed should contain limitations contrary to the rules prescribed in the statute; and that the first section enumerates conveyances made *directly to the wife in her own name,* merely in order to legalize such conveyances, and because they could not be made under the old law. And it follows that the position contended for cannot be maintained.

Again, it is contended in behalf of the appellant, that if the property was held under the operation of the Act of 1839, so much of

it, as was conveyed before the passage of the Act of 1846, was vested, by the fourth section of the former Act, in the child of Olive and wife, which interest could not be divested by the Act of 1846; and hence, that that property was not subject to distribution among that child and the children of the former marriage of Mrs. Olive.

This point has been expressly decided in *Marshall* v. *King*, 24 Miss. 85, in opposition to the position contended for.

It is supposed by counsel that the principle stated in that case was intended to be overruled in the case of *Garrett* v. *Dabney*, 27 Miss. 345. But that is a misapprehension. The question in that case was, whether a married woman had such an absolute power of disposition of property held by her to her separate use, as to enable her to dispose of it by will? And the principle there stated is, that rights were vested in the husband and children, which could not be defeated by the mere act of the wife. The vested rights of the husband and children are spoken of only with reference to the in- capacity of the wife to defeat them by her sole conveyance of the property, and not to hold that an estate was absolutely vested in the children at all events. And this is apparent when the expres- sions referred to, are taken in connection with the context.

The only other ground of error assigned is, that the decree charged the distributee West, with certain lands alleged by the amended petition, to have been conveyed to him as an advance- ment.

It is said that this was erroneous, because the answer denies the advancement, and there was no proof to sustain the allegation of the petition. This is true with respect to the tract of land, men- tioned in the original petition. But the amended petition charges that another specified tract of land, was given to this distributee by way of advancement. The answer does not deny this, but states the respondent's belief, that it was intended to be given to him as a compensation for certain services rendered by him to the intestate, for which he made no charge. The record does not purport to set out the proof taken in the cause, and therefore we cannot say that the decree is erroneous, especially, as the allegation of the petition is not positively denied.

Upon consideration of the whole case we think that the decree is

correct; and it is therefore affirmed, and the cause remanded, to be proceeded with upon the decree.